UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Randall Todd Royer, )
    Plaintiff, )
                                  )
                                  )
v.                               ) No. 1:10-cv-01196-HHK
                                  )
Federal Bureau of Prisons, )
    Defendant. )

## AMENDED COMPLAINT

### I. Introduction

1. This is a challenge under the Administrative Procedure Act ("APA") to a policy of the Federal Bureau of Prisons ("BOP") aimed at severely restricting the ability of prisoners it classifies as "terrorists" to communicate with friends, family, and the outside world. Taken together, the various aspects of this policy amount to a drastic departure from existing, published BOP regulations. The agency

has nevertheless evaded the APA's notice-and-comment requirements as to this policy, depriving Plaintiff, the prisoner population, and the public of their right to participate in its rulemaking.

II. Jurisdiction and Venue

2. The Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 5 U.S.C. § 551 et seq. (Administrative Procedure Act).

3. Venue in this Court is proper under 28 U.S.C. § 1391(e).

III. Parties

4. Plaintiff Randall Todd Royer, also known as Ismail Royer, is a federal prisoner in the custody of the BOP.

5. Defendant BOP is a federal agency under the APA. It is headquartered at 320 First Street, NW, Washington, DC 20534.

-3-

IV. <u>Facts Giving Rise to the Claims for Relief</u>

6. In or about 2006 the BOP developed a policy aimed at "managing" -- a euphemism for monitoring and severely restricting -- the ability of inmates it deemed to be "terrorists" to communicate with the world outside of prison.

7. As developed, this policy had several interrelated aspects. These aspects included (1) a new classification system whereby inmates in prisons across the country were "validated," or classified, as "terrorists," whether or not they were actually convicted of crimes of terrorism; (2) imposition of severe restrictions on the communications abilities of these inmates relative to ordinary inmates; and (3) removal of these inmates from the general or open population institutions and confinement of them in either existing units or institutions in conditions approximating administrative segregation, or in newly-created "Communications Management

-4-

Units" ("CMU's").

8. The BOP developed this policy as a means of managing inmates who did not qualify for Special Administrative Measures ("SAMs"). Unlike SAMS, which cannot be imposed without a court order or a determination by the Attorney General that an inmate's communications could result in death or serious bodily injury, the new policy comprised measures that were to be imposed on inmates whom the BOP had classified as "terrorists" -- on the basis of past association, or even religious or political beliefs -- but whose communications the BOP did not believe posed a threat warranting imposition of SAMS.

9. In April 2006 the BOP published in the federal Register a notice of a proposed rule that would have codified a substantial portion of this new policy. The BOP began this notice and comment procedure because the Rules Unit of its

Office of General Counsel had determined that the new policy amounted to a legislative rule requiring such procedure.

10. When a number of civil liberties groups submitted comments describing its proposed rule as unconstitutional, the BOP decided to adopt the new policy without publishing a final rule.

11. In December 2006, pursuant to the new policy, the BOP activated the First Communications Management Unit at the federal prison in Terre Haute, Indiana. Plaintiff, at the time classified by the BOP as a Medium Security inmate and now classified as Low Security, was removed from the open population at the medium security prison in White Deer, Pennsylvania, and transported to the Terre Haute CMU.

12. The BOP operates CMU's as a sort of laboratory or model for its policies towards "terrorist inmates." Not all inmates classified as such are

confined in CMU's. For various reasons, the BOP may also house such inmates in the Special Housing Units ("SHU's") at other institutions in administrative segregation -- albeit under heightened restrictions relative to other SHU inmates -- or in the Special Management Unit ("SMU") gang program at the penitentiary in Lewisburg, Pennsylvania. Another housing option for such inmates under the BOP's policy is the supermax prison in Florence, Colorado ("ADX"). Wherever they are confined, BoP policy generally requires that the conditions and restrictions imposed either approximate or exceed those of the CMU's.

13. In October 2009 plaintiff received an incident report at the Terre Haute CMU for involvement in an altercation with another inmate. In addition to disciplinary sanctions, any ordinary inmate would have received an administrative transfer to an another ordinary, low-security prison. Because

Plaintiff is subject to the BOP's "terrorist inmate" policy, however, which mandates "management" of his communication and other restrictions. Plaintiff was transferred to the ADX supermax prison. BOP policy generally provides that ADX inmates be given the opportunity to earn their way out of supermax confinement through clear conduct and a "step-down" program. Upon completion of the step-down program, BOP intends to transfer plaintiff to a CMU or another housing environment approximating CMU conditions and restrictions. Because CMU confinement is the default arrangement for "terrorist inmates," plaintiff's transfer to a CMU is the most likely scenario under BOP policy.

14. The BOP was sued by the ACLU in the Southern District of Indiana, and by the Center for Constitutional Rights in the District of Columbia, under the APA for failing to engage in notice-and-comment rulemaking as to the CMU's.

15. In response to the lawsuits, the BOP proposed a rule governing the CMU's, publishing notice in the Federal Register and setting a comment deadline of June 7, 2010.

16. The BOP's Office of General Counsel (OGC) is responsible for transmitting copies of rules published in the Federal Register for posting in institutions for review by inmates and staff. Because inmates have no access to the Federal Register other than such postings, they rely solely on them for information concerning proposed rules.

17. In the case of the proposed CMU regulation, the notice of proposed rulemaking was not posted for inmate review in ADX until after the comment period had expired, and then only in response to plaintiff's grievances. Upon information and belief, the fault for this lies with the Washington, DC-based OGC, meaning that no BOP inmate was informed of the proposed

-9-

rule in time to submit comments. The basis for this allegation is that an inmate who arrived at ADX from another institution after the June 7, 2010 comment deadline informed plaintiff that no such notice was posted at his institution, either.

18. Because the BOP views the CMU's as the model and yardstick for the restrictions and conditions of confinement appropriate for "terrorist inmates" regardless of where they are confined, the proposed rule will, if implemented, inevitably affect such inmates even if not currently confined in CMU's. And because CMU confinement is the default housing assignment for such inmates, there is a substantial likelihood that such inmates will be housed in a CMU in the future. Either way, implementation of the rule will reinforce and perpetuate plaintiff's confinement conditions.

19. The existing policy towards "terrorist inmates" modifies or deviates from existing rules published in the Code of Federal Regulations. For example, existing published rules do not permit indefinite

-10-

confinement in administrative segregation without a hearing, but the BOP policy requires that "terrorist inmates" be held in what amounts to administrative segregation indefinitely without meaningful review.

20. Existing regulations require that inmates be allowed to have physical contact with their visitors, with the sole exception that physical contact may be limited when it would jeopardize the security of the institution. In contrast, the "terrorist inmate" policy categorically disallows contact visits, not because the BOP believes such visits would jeopardize the security of the institution, but simply because it wants to monitor such visits, and even though it knows contact visits can be monitored just as effectively. Moreover, BOP published regulations require that inmates be provided with visits, whereas the "terrorist inmate" policy permits video conferencing sessions as a substitute, which is not, in fact, visitation.

-11-

21. Existing regulations permit personal interviews by members of the media, unless, e.g., the interview would endanger the interviewer or cause a disturbance in the institution. The "terrorist inmate" policy categorically disallows such interviews with subject inmates.

22. As a final example, the "terrorist inmate" policy allows the BOP to impose restrictions on inmates in the name of preventing terrorism, without the evidentiary or procedural requirements of the SAMs regulation, and without intervention by the Attorney General or a court order.

23. If a final CMU rule is published, inmates classified as "terrorist inmates" but not confined in a CMU will continue to be subject to the unpublished aspects of the "terrorist inmate" policy. Moreover, inmates confined in CMUs will still be subject to aspects of the "terrorist inmate" policy not explicitly addressed by the CMU rule, yet which nevertheless require notice and comment rulemaking.

—12—

24. Taken together, the various aspects of the "terrorist inmate" policy constitute a drastic, indefinite, and unreviewable departure for the subject class of inmates, from the rules and practices governing ordinary inmates.

## V. Claims for Relief

### A. Count One

25. The allegations of the preceding paragraphs are incorporated herein.

26. The BoP's "terrorist inmate" policy amounts to a substantive rule that requires notice and comment rulemaking under 5 U.S.C. §§ 553 and 552(a).

27. The BoP had the authority to engage in such rulemaking but failed to do so.

-13-

B. Count Two

28. The allegations of the preceding paragraphs are incorporated herein.

29. When the BOP's OGC, or its responsible officials at ADX Florence and other institutions, failed to inform Plaintiff and other inmates of the opportunity to comment on the proposed CMU rule by posting notice of that proposed rule before expiration of the comment period, the BOP violated the APA by effectively denying Plaintiff and other inmates the right to participate in agency rulemaking.

VI. Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that the Court:

a. Issue a judgment declaring that the BOP violated the APA by implementing

the "terrorist inmate" policy;

b. Issue a judgment declaring that the BOP violated the APA by failing to permit plaintiff and other BOP inmates to submit comments on the proposed CMU regulations;

c. Order the BOP to immediately engage in notice and comment rulemaking as to its "terrorist inmate" policy;

d. Permanently enjoin the BOP from implementing its "terrorist inmate" policy;

e. Order the BOP to comply with the published regulations its "terrorist inmate" policy modifies, detracts from, or violates;

F. Permanently enjoin the BOP from taking any further action on the CMU regulations, including publication of a final rule or its implementation, until plaintiff and other BOP inmates receive notice of, and opportunity to submit comments on, the proposed rule;

G. Award plaintiff his fees, costs, and expenses;

-15-

h. Grant such other and further relief as this Court deems just and proper.

Dated this 30th day of March, 2011.

Respectfully submitted,

*[signature]*

Randall Todd Royer
Reg. No. 46812-083
U.S. Penitentiary, ADX
P.O. Box 8500
Florence, CO 81226

VERIFICATION

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

March 30, 2011                    *[signature]*
Date                              Randall Todd Royer